## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MAINE

| | |
|---|---|
| In re:<br><br>MONTREAL, MAINE & ATLANTIC<br>RAILWAY, LTD.,<br><br>      Debtor. | Bk. No. 13-10670<br>Chapter 11 |
| ROBERT J. KEACH, solely in his capacity as the chapter 11 trustee for MONTREAL, MAINE & ATLANTIC RAILWAY, LTD.,<br><br>      Plaintiff<br><br>      v.<br><br>CAISSE DE DEPOT ET PLACEMENT DU QUEBEC;<br>EUREKA I, LP;<br>ATHENA FAMILY PARTNERS;<br>MP GLOBAL ENTERPRISES & ASSOCIATES, LLC;<br>EARLSTON ASSOCIATES, LP;<br>JERRY R. DAVIS; and<br>FRANK K. TURNER,<br><br>      Defendants. | Adv. Proc. 15-1014 |

## OMNIBUS OBJECTION TO MOTIONS TO DISMISS COMPLAINT
## (MEMORANDUM OF LAW INCORPORATED)

Robert J. Keach, solely in his capacity as the chapter 11 trustee of Montreal, Maine & Atlantic Railway, Ltd. (the "Trustee") hereby objects (the "Objection") to the following pleadings herein:

I.      Jerry R. Davis' Motion (A) To Dismiss Complaint Pursuant To Rule 12 Of The Federal Rules Of Civil Procedure And Bankruptcy Rule 7012 And (B) For Mandatory Abstention With Respect To Count I [D.E. 23] (the "Davis Motion");

1

II.     Athena Family Partners, Earlston Associates, LP, Eureka I, LP, MP Global

Enterprises & Associates, LLC, and Frank K. Turner's Motion to Dismiss Adversary

Proceeding [D.E. 24] (the "<u>Athena Motion</u>"); and

III.    Caisse De Depot et Placement Du Quebec's Motion to Dismiss Adversary

Proceeding [D.E. 25] (the "<u>Caisse Motion</u>" and collectively with the Davis Motion

and the Athena Motion the "<u>Motions to Dismiss</u>").

Because the Motions to Dismiss contain overlapping arguments for dismissal, the Trustee

respectfully submits that it is appropriate to object in a single pleading, and to the extent that

separate pleadings would normally be required, the Trustee requests that the Court dispense with

any such requirement in the context of the Motions to Dismiss.  In support of his Objection, the

Trustee states as follows:

## <u>Preliminary Statement</u>

The Trustee's Complaint herein presents, through well-pled factual allegations, the

history of a Debtor that was thinly capitalized and financially distressed for its entire history.

The Debtor's business was not a simple enterprise, and its finances were correspondingly

complex.  Nonetheless, the Complaint presents a detailed history of a distressed business, whose

operations and finances were closely watched by a small group of Investors (with inside access

to the Debtor's finances and operations).[1]  The Investors were frequently reminded of the

Debtor's inability to pay its debts as they came due, through, among other things, no less than six

workouts of the Investors' alleged Notes, in each instance precipitated by a payment and/or

covenant default.

At the 11th hour, with the Debtor hopelessly unable to pay any of its debts, the Investors

---

[1] Capitalized terms not otherwise defined herein, shall have the meaning ascribed to them in the
Complaint.

watched as the State of Maine proposed what can only be described as a bailout of the Debtor's failing railroad.  Exercising their inside influence on the Debtor's corporate operations, the Investors used the opportunity to extract what little value the bailout provided to pay out the full value of their chronically defaulted Notes.  The Debtor was insolvent from its creation through the Sale of the Lines, and the payment of the Investors' Notes is best (and appropriately) viewed as an unlawful dividend in an insolvent company.  Although the Investors take an optimistic view of history, events subsequent to the Sale of the Lines did not render the Debtor solvent (nor would that matter).  Despite the ample factual allegations in the Complaint to support each of the Trustee's counts, the Investors argue, against the weight of history, that they can bear no liability for extracting the payment of their alleged debts from a distressed business, one whose finances and operations they had enhanced access to.  The extraction of these funds through the demands of the Investors—who cynically seized upon an opportunity to get paid in full under threat of bringing down the railroad—was not of no consequence.  Without the funds that were instead used to pay the Investors, the Debtor was unable to invest in much needed safety and capital improvements, including, without limitation, track maintenance and other critical investments. There is a straight line between this diversion of working capital and the condition that the railroad was in at the time of the Lac Mégantic derailment.

As set forth in detail herein, the Motions to Dismiss must be denied, the Defendants should be required to answer, and this adversary proceeding should proceed to discovery and conclusion as expeditiously as possible.

## Argument

I.      The Complaint More Than Satisfies The Pleading Requirements

On a motion to dismiss, the Court must accept as true the factual allegations of the

complaint and draw all reasonable inferences in favor of the plaintiff.  See Trans-Spec Truck
Serv., Inc. v. Caterpillar, Inc., 524 F.3d 315, 320 (1st Cir. 2008).  A complaint should survive
dismissal where it alleges a plausible entitlement to relief.    Gargano v. Liberty Int'l.
Underwriters, Inc., 572 F.3d 45, 49 (1st Cir. 2009).  "[E]valuating the plausibility of a legal
claim 'requires the reviewing court to draw on its judicial experience and common sense.'"
Ocasio-Hernandez v. Fortuno-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Aschroft v. Iqbal,
556 U.S. 662, 679 (2009).  Indeed, "the court may not disregard properly pled factual
allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  Id.
(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).  "The relevant inquiry
focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to
draw from the facts alleged in the complaint." Id. at 13.  The complaint is sufficient if it sets
forth either direct or inferential factual allegations respecting each material element of a cause of
action.  Lumb v. Cimenian (In re Lumb), 401 B.R. 1, 6 (BAP 1st Cir. 2009) (citing Gagliardi v.
Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)); see also Adv. Proc. 14-1001, D.E. 140 (denying
Canadian Pacific Railway Corp.'s motion to dismiss).

As set forth in detail below, the Complaint alleges facts which support each material
element of each count set forth therein.  Given the detailed factual history in the Complaint, it is
eminently reasonable for the Court to infer the liability the Trustee asks the Court to draw from
that history.  Moreover, given the fact-sensitive nature of all counts, the Motions to Dismiss
could only be successful if the Court drew all inferences against the Trustee and in favor of the
moving parties, which is the opposite of the standard for a motion to dismiss.

II.    Allegations and Argument Relevant to Multiple Counts

### A.    The Derailment is Not Relevant to the Complaint

Before proceeding to the individual counts, the Trustee must address an argument made by all of the Defendants: that the Derailment on July 6, 2013 caused the Debtor's bankruptcy, and that fact somehow absolves the Defendants of liability for their extraction of cash from an insolvent business.  All of the counts in the Complaint depend, at least in part, on the Debtor's insolvency *at the time of the transfers*.  See e.g., 6 Del. C. § 1305(a) ("…the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation."); 14 M.R.S.A. § 3576(1).  The law dictates only that the Debtor be insolvent at the time of the transfers in question.  It does not require that the Debtor remain insolvent from the time of the transfers until such time as those transactions are scrutinized.  Cf. Holahan v. Henderson, 277 F. Supp. 890, 896 (W.D. La. 1967) aff'd, 394 F.2d 177 (5th Cir. 1968).  To do so would create a backwards rule where, in essence, if a party later recovered from a wound inflicted by others, the Court would find that there was no wound and no assault.

Nowhere in the Complaint does the Trustee suggest that the Debtor was anything but insolvent at the time of the relevant transactions or rendered further insolvent by such transactions.  Indeed, the Trustee's expert will so testify.  Statements elsewhere in the Debtor's bankruptcy case that the Derailment precipitated the bankruptcy are fundamentally irrelevant. Suggestions that the Debtor's oil-by-rail business (which does not appear in the Complaint) suddenly rendered the Debtor solvent are similarly irrelevant, and, based upon the Trustee's investigation, wrong.  Many debtors have an event that precipitates their bankruptcies.  The fact that the debtors were allegedly "fine" up until the event forced them into bankruptcy is insufficient to establish that they were previously solvent.  This is even truer where the party

making the suggestion is doing so in a motion to dismiss.  Simply put, the Derailment and the

Debtor's oil-by-rail business are not relevant to the Motions to Dismiss, and any argument or

conclusion based on them should be summarily disregarded.[2]

### B.    None of the Counts are Barred by Any Statute of Limitations

The Davis Motion argues that the Trustee's request for recharacterization of debt as

equity is barred by the statute of limitations.  However, the argument uses inapplicable statutes

of limitations to conclude that recharacterization must be barred in this case.  To the contrary, as

several courts have found, "[a] claim to recharacterize debt as equity is not statutorily based and

there is no explicit statute of limitations."  Pry v. Maxim Global. Inc. (In re Maxim Truck Co.,

Inc.), 415 B.R. 346, 359 (Bankr. S.D. Ind. 2009); see also Official Comm. of Unsec. Creds. v.

Foss  (In re Felt Mfg. Co., Inc.), 371 B.R. 589, 629 (Bankr. D.N.H. 2007) ("Since [the count] is a

recharacterization claim brought under the Bankruptcy Code, as part of seeking a determination

from the Court regarding the proper treatment of the obligations of [the Defendant] for purposes

of distribution from the bankruptcy estate, this Court discerns no applicable statute of limitations

justification for dismissal of [the count].").

Even if a statute of limitations outside of the Bankruptcy Code were applicable, no such

applicable statute of limitations bars the Trustee's request for recharacterization of debt as

equity.  The remaining counts arise from the Sale of the Lines, the P&S for which was executed

on or about January 4, 2011 (less than three years prior to the Petition Date).  Under Delaware

law, the statute of limitations for causes of action pursuant to §§ 1304(a) and 1305(a) is four

years.  6 Del. C. § 1309(1) and (2).  Under Maine law, the statute of limitations for UFTA causes

of action is six years.  14 M.R.S.A., § 3580(1) and (2).  Of course, in the event of bankruptcy, the

---

[2] For the avoidance of doubt, it is the Trustee's position, upon information and belief, that the Debtor was
never solvent.

statute of limitations is the *greater* of the period remaining at state law or two years from the petition date.  11 U.S.C. § 108(a).

> ### C.   The Complaint More than Adequately Supports a Recharacterization of Debt as Equity with Regard to the Notes

Recharacterization is grounded in the bankruptcy courts' equitable authority under § 105(a) of the Bankruptcy Code.  Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 454 (3d Cir. 2006) (citations omitted).  Bankruptcy courts now generally consider recharacterization a separate cause of action, distinct from equitable subordination.  See id. at 454-55; Aquino v. Black (In re AtlanticRancher, Inc.), 279 B.R. 411, 433 (Bankr. D. Mass. 2002) (collecting cases).  As a result, a court can "recharacterize debt as equity in a case in which a creditor has contributed capital to a debtor in the form of a loan, but the loan has the substance and character of an equity contribution."  AtlanticRancher, 279 B.R. at 433 (citations and quotations omitted).

Courts use a variety of multi-factor tests to determine whether to recharacterize debt as equity.  SubMicron, 432 F.3d at 455.  For example, the bankruptcy court in AtlanticRancher applied the following multi-factor test found in Diasonics, Inc. v. Ingalls, 121 B.R. 626, 631 (Bankr. N.D. Fla. 1990):

> 1) The adequacy of capital contributions;
> 2) The ratio of shareholder loans to capital;
> 3) The amount or degree of shareholder control;
> 4) The availability of similar loans from outside lenders;
> 5) Certain relevant questions, such as
>    a. whether the ultimate financial failure was caused by undercapitalization;
>    b. whether the note included payment provisions and a fixed maturity date;
>    c. whether a note or other debt document was executed;
>    d. whether advances were used to acquire capital assets; and
>    e. how the debt was treated in the business records.

AtlanticRancher, 279 B.R. at 433 (citations omitted).  Courts in the First Circuit tend to follow

AtlanticRancher.  See Felt Mfg., 371 B.R. at 630.

In contrast to the AtlanticRancher factors, the Sixth Circuit Court of Appeals has applied

the following eleven factor test regarding recharacterization:

1) The names given to the instruments, if any, evidencing the indebtedness;
2) The presence or absence of a fixed maturity date and schedule of payments;
3) The presence or absence of a fixed rate of interest and interest payments;
4) The source of repayments;
5) The adequacy or inadequacy of capitalization;
6) The identity of interest between the creditor and the stockholder;
7) The security, if any, for the advances;
8) The corporation's ability to obtain financing from outside lending institutions;
9) The extent to which the advances were subordinated to the claims of outside creditors;
10) The extent to which the advances were used to acquire capital assets; and
11) The presence or absence of a sinking fund to provide repayments.

Bayer, Corp. v. MascoTech, Inc. (In re AutoStyle Plastics, Inc.), 269 F.3d 726, 749-50 (6th Cir.

2001).  This eleven factor test is the prevalent test in Delaware bankruptcy courts.  Official

Comm. of Unsec. Creds. v. Highland Capital Mgmt L.P. (In re Moll Industries), 454 B.R. 574,

581-82 (Bankr. D. Del. 2011).  While First Circuit courts have not used the eleven factor test

from AutoStyle, one bankruptcy court noted that this was because, in the view of those courts, "it

suggests that undercapitalization alone may be sufficient to justify recharacterization of debt as

equity."  Felt, 374 B.R. 629-30.  This indicates that AutoStyle is not irrelevant in the First

Circuit, and can be used with caution.  Cf. id. at 630 (reiterating that no one factor is controlling

or decisive).

In spite of these seemingly mechanical approaches to recharacterization, the Third Circuit

Court of Appeals observed that "[n]o mechanical scorecard suffices.  And none should, for

Kabuki outcomes elude difficult fact patters."  SubMicron, 432 F.3d at 456.  Indeed, cases

decided in Delaware after SubMicron have applied augmented tests, which include additional

factors.  See, e.g., Autobacs Strauss, Inc. v. Autobacs Seven Co. (In re Autobacs Strauss, Inc.),

473 B.R. 525, 572-73 (Bankr. D. Del. 2012) (applying a 13 factor test, including a catch-all

"other considerations" factor).  The Fourth Circuit Court of Appeals has noted, in applying the

AutoStyle test, "[t]his test is a highly fact-dependent inquiry that will vary in application from

case to case."  Fairchild Dornier GMBH v. Official Comm. of Unsec. Creds. (In re Dornier

Aviation, Inc.), 453 F.3d 225, 234 (4th Cir. 2006).

Numerous allegations in the Complaint support a recharacterization of the Investors'

Notes as equity in the Debtor.  Considering the AtlanticRancher factors: (A) the Debtor was

inadequately capitalized (Complaint, ¶¶63-64, 167-69); (B) the ratio of shareholder loans far

exceeded capital (Complaint, ¶¶63-64, 153, 155); and (C) there was a high amount of

shareholder control (Complaint, ¶¶170-171) and significant overlap between shareholders and

Noteholders.  Moreover, the chronic relaxation of covenants, including minimum interest

coverage, minimum fixed charge coverage ratio, senior leverage ratio, and total leverage ratio,

dovetails closely to the AtlanticRancher factors.  Further, the Complaint amply shows that the

Notes were never performing (Complaint, ¶¶48-104, 133), and were convertible to preferred

stock or redeemable by the Debtor's largest shareholder (Complaint, ¶¶135-37).  The Investors

only attempted to take security for their Notes more than two years after the Notes were

originally issued, and after they had been non-performing and in default (Complaint, ¶¶67-69).

As part of the NWPA, the Investors obtained warrants, and such warrants were left in place

following the payoff of the Notes (Complaint, ¶¶106, 132).   While the Notes themselves may

have provided for a maturity date and schedule of interest payments, in actuality, the Notes were

non-performing and never paid on any regular basis (if at all).  Obviously, the "amendment fees"

do not constitute note payments, and resemble a dividend far more than they resemble an actual

payment on the Notes.   An amendment fee is neither a payment of principal or interest; it is simply a gratuitous payment to a noteholder (or, in actuality, a disguised dividend).   Moreover, the Notes were freefalling toward their maturity date without any hope of payment, until the State of Maine offered its bailout.   In short, despite their documentation, the Notes had the character of and were treated like equity, regardless of how they were accounted for.   There is no evidence that, despite the alleged terms, the holders of the Notes ever expected payment outside of a capital liquidity event, such as a sale of significant or all assets.   Finally, because the replacement notes were issued on December 31, 2007, it would be reasonable to reexamine the recharacterization factors as of that date as well (when the Debtor was in default on all of its material obligations, and had amended the NWPA four times already while issuing the replacement notes in connection with a fifth amendment in which it was in default on all relevant financial covenants).   No outside, third party lender would have extended credit at that time. Thus, it is appropriate, under the applicable standards and caselaw, for the Court to recharacterize the Notes as equity.

Faced with ample factual allegations to support recharacterization, Caisse de Depot is forced to flat-out mischaracterize or simply ignore the clear allegations of the Complaint in order to create its argument.   For example, Caisse de Depot states that "the trustee has not alleged that the Debtor was inadequately capitalized after it was formed in 2002 or in January 2003 when the Notes were issued."   Caisse Motion, p.16.   However, the Complaint explicitly states:

> The more than two-year interval between the MMA Companies' beginning operations and receiving the FRA Loan establishes that *the MMA Companies were thinly capitalized from the date of the NWPA (January 8, 2003) until the date of the FRA Loan (March 24, 2005).*

Complaint, ¶64.   Elsewhere, Caisse de Depot states that "the Trustee's allegations reflect the fact that, for at least three years, the Debtor serviced the interest on the notes," citing to paragraph 74

of the Complaint.    However, paragraph 74 of the Complaint states that "[i]n the Fourth Amendment to NWPA, the MMA Companies acknowledged that they were in default under the NWPA due to non-payment of interest under the Notes."   Elsewhere in the Complaint, the Trustee alleged that "The Notes were never performing" and "were in default at all times leading up to the 2011 Termination"  (Complaint, ¶¶173-74).   Repeatedly, Caisse de Depot either twists the allegations in the Complaint to attempt to make them more favorable to Caisse de Depot (and thus depart completely from the motion to dismiss standard), or outright mischaracterizes or misquotes them.   In other instances, it simply pretends that what the Complaint actually says is not there.

The  Athena  Motion  takes  a  different  approach,  arguing  that  even  if  the  Trustee sufficiently pleads a cause of action for recharacterization, the Trustee cannot then proceed on the theory that the Defendants were equity holders for purposes of an improper dividend.   Athena Motion,  p. 13.    However,  "recharacterization  is  well  within  the  broad  powers  afforded  a bankruptcy court in § 105(a)."   Dornier Aviation, 453 F.3d at 231.   "A bankruptcy court's equitable powers have long included the ability to look beyond form to substance."   Id. at 233 (citing Pepper v. Litton, 308 U.S. 295, 305 (1939)).   While the Athena Motion states that it cannot locate any case where an improper dividend finding followed a recharacterization of debt, it also fails to cite to any authority to suggest that such a result is barred.   Nonetheless, it still requests that the Court find in its favor *as a matter of law*.    However, the use of recharacterization of debt as a step towards recovering on other causes of action is supported by caselaw.   See Musicland Holding Corp. v. Best Buy Co., Inc. (In re Musicland Holding Corp.), 398 B.R. 761, 775 (Bankr. S.D.N.Y. 2008) ("Although Best Buy has not asserted a claim against the Musicland estates, the validity of the Debt Instruments is still relevant. The recharacterization

claim, in this regard, is essentially one to declare the Debt Instruments void, and is integral to the fraudulent transfer claims."). And, of course, Athena's argument defies common sense. If the notes were in fact equity from the date of their issuance, as alleged, then any payments upon such instruments would by necessity be dividends, which dividends, if paid by an insolvent entity, would be improper. This is simply the application of clear statutes and settled law to the recharacterized instruments. Thus, on its face, this is an insufficient basis for a motion to dismiss.

### D.    The Complaint More than Adequately Supports a Finding that the Defendants are Insiders

Title 6, section 1301(7)(b) of the Delaware Code provides a definition of corporate insider.[3] The Motions to Dismiss all take pains to attempt to eliminate the "categorical" insiders. However, the statutory definition of insider is *not exclusive.* In re Imageset, Inc., 299 B.R. 709, 713 (Bankr. D. Me. 2003). Whether or not one or more (or none) of the subsections applies is irrelevant, and does not establish a basis for a motion to dismiss.

As this Court (Haines, J.) previously found, when examining 14 M.R.S.A. § 3572(7)[4]:

> The Maine UFTA definition of "insider" is derived from the definition in Bankruptcy Code § 101(31), with minor variations. Although the definition is extensive, it is not exhaustive. The drafters purposely preceded the listed categories of insider entities with the word "includes" to make clear that *the statutory definition is not exclusive.*

Id. (emphasis added).

The commissioner's comment to Maine's adoption of UFTA supports this view: "The definition of 'insider' is derived from § 101[31] of the Bankruptcy Code. . . . As in the Bankruptcy Code (See 11 U.S.C. § 102(3)), the word 'includes' is not limiting."  14 M.R.S.A. §

---

[3] 14 M.R.S.A. § 3572(7)(b) provides an identical definition.

[4] Maine and Delaware have adopted substantially identical versions of the Uniform Fraudulent Transfer Act ("UFTA").

3572 cmt. at (7).

Because UFTA's definition of insider is not exhaustive, "it is for the courts to define the limits of non-statutory insider status." <u>See</u> <u>In re A. Tarricone, Inc.</u>, 286 B.R. 256, 262 (Bankr. S.D.N.Y. 2002) (collecting cases).

As the Tenth Circuit Court of Appeals has found:

> [T]he authorities are in agreement that there are two distinct types of insiders, [first] those entities specifically mentioned in the statute ("relative," "partnership," "general partner," and "corporation"), *i.e.* per se insiders, or [second] those not listed in the statutory definition, but who have a "sufficiently close relationship with the debtor that ... conduct is made subject to closer scrutiny than those dealing at arm's length with the debtor."

<u>In re Kunz</u>, 489 F.3d 1072, 1079 (10th Cir. 2007) (citations omitted).

Courts considering whether an insider relationship exists have generally focused on two factors, "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." <u>In re Holloway</u>, 955 F.2d 1008, 1011 (5th Cir. 1992) (collecting cases); <u>In re Krehl</u>, 86 F.3d 737, 742 (7th Cir. 1996); <u>see also</u> <u>Norwood Co-op. Bank v. Gibbs</u>, 2012 WL 4094328, at *7 (D. Mass. Sept. 13, 2012) (examining the definition of "insider" under UFTA); <u>In re Schuman</u>, 81 B.R. 583, 586 (B.A.P. 9th Cir. 1987) ("The tests developed by the courts in determining who is an insider focus on the closeness of the parties and the degree to which the transferee is able to exert control or influence over the debtor.").

Moreover, courts have repeatedly found that:

> [I]nsider status may be based on a professional or business relationship with the debtor, in addition to the Code's *per se* classifications, where such relationship compels the conclusion that the individual or entity has a relationship with the debtor, close enough to gain an advantage attributable simply to affinity rather than to the course of business dealings between the parties.

<u>In re Friedman</u>, 126 B.R. 63, 70 (B.A.P. 9th Cir. 1991).

The legislative history of § 101(31) of the Bankruptcy Code (from which UFTA is derived) states that an insider "is one who has a sufficiently close relationship with the debtor that his conduct is made subject to closer scrutiny than those dealing at arms [sic] length with the debtor." In re U.S. Med., Inc., 531 F.3d 1272, 1277 (10th Cir. 2008) (citing S.Rep. No. 95-989, at 25 (1978), 1978 U.S.Code Cong. & Admin.News 5787, 5810; H.R.Rep. No. 95-595, at 312 (1977)). Courts look past formalities when examining whether a person or entity is an insider. See In re Fortune Natural Res. Corp., 350 B.R. 693, 696 (Bankr. E.D. La. 2006) (finding that when an individual "is without question an insider of the debtor, it would be both folly and a triumph of form over substance to hold that the LLC over which [the individual] exerts complete control is not an insider."). Finally, as this Court has remarked previously, in discussing non-statutory insiders, "almost uniformly, cases decided on the basis of the elasticity inherent in the insider concept ***have been determined after trial, on a fully developed evidentiary record***." Imageset, 299 B.R. at 717 (emphasis supplied).

The Complaint explains the relationship of the Investors to the Debtor, specifically, one in which the Debtor's controlling shareholder, along with other equity-holders, several of whom appointed directors to the Debtor's Board, closely watched and dictated the Debtor's operations. Had the Debtor not dealt directly with the Defendants as an adverse counterparty, there would be little to discuss. However, the Debtor and the Defendants had a close relationship for years. As the six restructurings of the Notes show, the parties frequently exchanged information and "negotiated" increasingly relaxed terms for the ostensible Notes. By the time the State of Maine offered the Debtor a lifeline, the Defendants were intimately aware of the Debtor's dire financial condition, and inserted themselves into the transaction to extract the payment of the Notes, a payment that the cash-strapped Debtor could ill afford to make, and one that no debtor

14

independent of the control of the Investors would have made.  Indeed, the Complaint alleges that

the payment was a direct product of the Investors' control of the Debtor, given the overlapping

ownership of equity and control of and influence over the Debtor's management.  Accordingly,

the Complaint more than sufficiently establishes a remarkably close relationship between the

Defendants and the Debtor (certainly beyond the "typical" relationship between a lender and a

borrower), which indicates that no transaction between the Defendants and the Debtor could be

viewed as being made at arms-length.   While the Complaint establishes a close relationship

between the Defendants and the Debtor, discovery will allow the parties to determine just how

close the relationship was.  The Complaint's detailed allegations show a collection of people and

related entities who structured six different workouts of their alleged "debt," who enjoyed

enhanced access to the Debtor and its financial condition, including through seats on the

Debtor's Board of Directors, and who made sure their junk "debt" (which was in fact equity

from the date of the issuance) was paid first in what was supposed to be a bailout transaction that

would provide the Debtor with critical working capital.   Under the applicable standards noted

above, those allegations are more than sufficient to establish plausible claims of insider status.

### E.   The Complaint More than Adequately Supports a Finding that the Transfers Consisted of Assets within the UFTA Definition

The counts in the Complaint concern fraudulent transfers under the UFTA.  The Motions

to Dismiss focus on the UFTA definition of "transfer," and the related definition of "asset."  The

UFTA defines transfer as:  "every mode, direct or indirect, absolute or conditional, voluntary or

involuntary, of disposing of or parting with an asset or an interest in an asset, and includes

payment of money, release, lease or creation of a lien or other encumbrance."   14 M.R.S.A. §

3572(12); 6 Del. C. § 1301(12).  UFTA defines "asset," in relevant part, as "property of a debtor,

but does not include: A. Property to the extent that it is encumbered by a *valid lien*."   14

M.R.S.A. § 3572(2) (emphasis added); 6 Del. C. § 1301(2).  UFTA defines a "valid lien" as "a

lien that is effective against the holder of a judicial lien subsequently obtained by legal or

equitable process or proceedings."   14 M.R.S.A. § 3572(13); 6 Del. C. § 1301(13).  Thus, the

Payment was an asset for the purposes of UFTA to the extent that it was not encumbered by a

valid lien and/or represented unencumbered value in excess of any valid lien.  See Citizens Nat.

Bank of Texas v. NXS Const., Inc., 387 S.W.3d 74, 82 (Tex. App. 2012) ("the value of property

in excess of a valid lien encumbering the property is an 'asset' as defined by UFTA."); Tel.

Equip. Network, Inc. v. TA/Westchase Place, Ltd., 80 S.W.3d 601, 610 n.6 (Tex. App. 2002)

(citing cases from other jurisdictions that have adopted UFTA).

       The Motions to Dismiss argue that the fraudulent transfers were not transfers of "assets"

because any payments were encumbered by the FRA's (or other) liens.   Here, the Second

Amendment to FRA Loan *released* the FRA's security interest in the proceeds of the sale of the

Lines upon the FRA receiving security interests in additional "Canadian Assets" of the Debtor.

Under the UFTA, the existence of a restriction – or more accurately in this instance, a condition

– on the asset transferred is not sufficient to remove the transfer from the UFTA definition of

asset.  Rather, the asset must be encumbered "by a valid lien." The fact that certain proceeds of

the Sale of the Lines were designated for payment to certain parties does not rise to the level of

"a lien that is effective against the holder of a judicial lien subsequently obtained by legal or

equitable process or proceedings."   Moreover, unlike many of the cases that have considered

whether the property transferred was an asset under UFTA, the Complaint makes it clear that the

2011 Sale of the Lines was not an ordinary transaction; it was a bailout or a lifeline offered by

governmental entities to attempt to save a failing railroad.  It was the clear intent of the State of

Maine and the FRA to generate some cash for the Debtor's business operations. The fact that the Defendants inserted themselves in the bailout transaction does not elevate them to the status of legitimate, non-insider creditors.[5] Thus, the Payment was an asset under the UFTA definition precisely because the only valid lien that had ever existed upon the funds—that of the FRA— was released prior to the transfers in question. More to the point, given that these are motions to dismiss, the Complaint clearly alleges that the funds were unencumbered due to the FRA's release of its liens. That the Defendants disagree with that allegation as a matter of fact is irrelevant—that is a matter of evidence not of pleading.

The Caisse Motion makes several attempts to push the $13,862,165.29 payment made in connection with the 2011 Termination outside the definition of "asset." All must fail in the present context.

First, Caisse de Depot suggests that the First Circuit Court of Appeals has confirmed the "asset" requirement "under the plain language of the . . . statute" (Caisse Motion, p.22). However, the quoted language follows a discussion of intent under the UFTA, and the point is unhelpful to Caisse de Depot's arguments elsewhere:

> Normally, it is a question of fact whether a transfer was made with actual intent to defraud. At least arguably, moreover, [the plaintiff] adduced enough competent evidence to enable the jury to infer that defendants deliberately arranged a conveyance of the . . . assets with the specific intent to leave the [plaintiff's] claim unsatisfied. Nonetheless, under the plain language of the Rhode Island statute, the actual intent of the defendants was immaterial as a matter of law.

Ed Peters Jewelry Co. v. C & J Jewelry Co., 124 F.3d 252, 261-62 (1st Cir. 1997). Peters Jewelry cites to Richman v. Leiser, 465 N.E.2d 796 (Mass. App. Ct. 1984) for the proposition that "[a] conveyance is not established as a fraudulent conveyance upon a showing of a

---

[5] To the extent that the Defendants attempt to argue that the Notes were actually secured by a valid lien, the Complaint does not allege that the Deed of Hypothec gave the Defendants a valid lien in the Lines, which is unlikely, given that the Lines are real property.

Case 15-01014    Doc 42    Filed 11/10/15    Entered 11/10/15 16:07:49    Desc Main
Document        Page 18 of 31

fraudulent intention alone; there must also be a resulting diminution in the assets of the debtor available to [unsecured] creditors.  Peters Jewelry, 124 F.3d at 262 (1st Cir. 1997).[6]  The diminution requirement is hardly a revelation, and the Complaint supports a finding that the payment to the Defendants, who were, at best, general unsecured insider creditors (to the extent they were not equity) diminished the assets available to creditors.  In this case, the FRA was prepared to release, and did release, its lien in order to create millions in unencumbered working capital for use in the Debtor's operations and for capital improvements, all of which would have increased the Debtor's value, for all creditors.  The Investors diversion of that money to themselves meant that it was not invested in the Debtor, leaving the Debtor's assets to decline in value rather than improve, and depriving it of cash assets that would otherwise have been the Debtor's alone.  That is the very definition of diminution of value.

Achille Bayart & Cie v. Crowe, 238 F.3d 44, 45 (1st Cir. 2001) is also distinguishable. There, a non-debtor entity bought out the debtor's secured creditor (a bank) at just below par, and became the debtor's secured creditor.  An unsecured creditor later brought suit under the UFTA, alleging that there was equity in the debtor beyond the amount the non-debtor entity paid the bank in exchange for the debt and security interest.  The case was tried to a jury, but decided under Fed. R. Civ. P. 50(a), on the basis that there was insufficient evidence to permit a jury to conclude that there was value in the assets of the debtor over and above the amount of its secured debt, which the First Circuit affirmed.  Id. at 46 and 49.[7]  Here, the Debtor sold a portion of its

---

[6] Peters Jewelry involved a transaction that resembled a collusive foreclosure sale, carried out with cooperation between the debtor and its secured creditor.  The secured creditor (a bank) had a valid lien on all assets that were transferred, and essentially replaced that lien following the foreclosure.  For these reasons, Peters Jewelry is not relevant to the Complaint herein.

[7] Fleet Nat'l Bank v. Valente (In re Valente), 360 F.3d 256, 260 (1st Cir. 2004) also held that fully encumbered property did not constitute an asset under the UFTA, and is thus similarly not relevant to the Trustee's allegations.

assets to the State of Maine in a friendly deal. The FRA and the MaineDOT *released* their security interests with the intent of creating working capital *for the debtor*. <u>Crowe</u> is distinguishable precisely because the liens were released in this case, thus eliminating the lien that would otherwise have encumbered the funds.

Caisse de Depot would have the Court believe that <u>Mullins v. TestAmerica, Inc.</u>, 564 F.3d 386 (5th Cir. 2009) is directly on point and controls the result in this case. As a preliminary matter, TestAmerica was decided on appeal after a jury trial, thus establishing the factual and evidentiary nature of the inquiry at issue. <u>Id.</u> at 399. More importantly, the case involved the sale of *all of the debtor's assets* to a third party, for a sum that was far less than the outstanding secured debt. Here, the State of Maine, one of the Debtor's creditors, offered the Debtor a bailout, with the intent of providing *the Debtor* with working capital. The FRA, also one of the Debtor's creditors, agreed to the transaction and agreed to accept less than it was entitled to further the goal of providing *the Debtor* with working capital. Accordingly, they released their liens, thus eliminating the encumbrance. However, the end result was that unencumbered money intended for the Debtor was diverted to insider creditors holding "debt" that should be recharacterized as (and which was at all times) equity. Cases finding that fully-encumbered assets are not UFTA "assets" are irrelevant given the facts alleged in the Complaint, i.e., that unencumbered assets (due to lien releases) were diverted to the Investors, and which funds otherwise would have been unencumbered funds of the Debtor. Moreover, Caisse de Depot argues that the UFTA is designed to protect creditors from diminutions in value and avoid only those transfers where the property would have been available to at least one of the debtor's creditors.[8] That is precisely what the Complaint alleges; the money diverted would have been

[8] Caisse de Depot cites to <u>In re First Alliance Mortgage Co.</u>, 471 F.3d 977 (9th Cir. 2006) and <u>Bear, Stearns Sec. Corp. v. Gredd</u>, 275 B.R. 190 (S.D.N.Y. 2002), respectively.

the Debtor's working capital, and would have been available to create value and pay legitimate creditors; instead it was used to pay an illegal dividend to the Investors who cynically grabbed their money and ran, leaving behind an insolvent Debtor.  The State of Maine intended precisely that: the funds the State paid for the Lines were supposed to go to help the Debtor's failing business, not simply pay off a select group of favored investors.  The funds were intended to be free capital until the Investors, through extortionate demands, diverted the bulk of them to themselves.

> **F.**   **To the Extent Necessary, the Complaint Contains Numerous Allegations that Establish Creditors Whose Claims Arose Prior to the Transfers and Whose Claims Still Existed on the Petition Date**

The Caisse Motion's insistence that the Trustee has not identified a "golden creditor" is misguided, especially at the current pleadings stage.[9]   For the purposes of § 544(b) of the Bankruptcy Code, the Complaint, at most, "must demonstrate the existence of an actual unsecured creditor holding an allowable unsecured claim who could avoid the transfers at issue." Imageset, 299 B.R. at 715 (Bankr. D. Me. 2003).  The Complaint makes clear that the FRA and the MaineDOT, along with Wheeling and Earlston (on the Term B Note), all held claims at the time of the transfers alleged, and all still hold claims against the Debtor.  (In addition, the Trustee could, by simple amendment to the Complaint, list several other such creditors, including, ironically, the various Rail World entities, and various railroads doing business with the Debtor).  Moreover, those claims are clearly undersecured at best and perhaps wholly unsecured (and have been since the challenged transaction).  With the Debtor's business assets sold, and the FRA and the MaineDOT remaining creditors herein, it is abundantly clear that those creditors were

---

[9] The Athena Motion makes the same argument.

undersecured as of the Petition Date and before.[10]  To conclude otherwise would require the

Court to depart from the motion to dismiss standard.[11]  Moreover, it is hardly settled law that, at

the pleadings stage, a plaintiff must identify a specific creditor.  Cf. Brandt v. Leasing One Corp.

(In re Equip. Acquisition Res., Inc.), 481 B.R. 433, 440 (Bankr. N.D. Ill. 2012) ("it is

unnecessary for Plaintiff to identify a creditor whose claim existed at the time of the allegedly

fraudulent transfer.").

   While Caisse de Depot will undoubtedly argue that the FRA and MaineDOT cannot be

"golden creditors," the caselaw on which they rely is far from decisive.  U.S. Bank Nat. Ass'n v.

Verizon Commc'ns Inc., 479 B.R. 405, 411 (N.D. Tex. 2012) states that a "creditor who ratifies

or participates in a fraudulent transfer *may* be estopped from attacking the transfer."  (emphasis

added, citation omitted).  Weisfelner v. Fund 1. (In re Lyondell Chem. Co.), 503 B.R. 348

(Bankr. S.D.N.Y. 2014) concerned a failed leveraged buyout, which was undoubtedly not

undertaken for the debtor's benefit.  Further, the case's strict requirement of identifying a

"golden creditor" is not well-settled law.  The case itself notes the existence of Musicland, a case

which, faced with essentially the same question, found "the relative ease and obvious wisdom of

leaving the actual identification of qualifying creditors to discovery and trial" to be persuasive.

398 B.R. at 781 n.13.  In any event, as noted above, the Trustee has identified other creditors and

could, by simple amendment, identify more.  This entire argument is a red herring, precisely the

reason the better-reasoned cases save this issue for a time when the facts are more fully

developed.

---

[10] While Wheeling has attempted (through creative arguments that border on fantasy) to argue that it is
somehow fully secured, it is clear, at least at the pleadings stage, that Wheeling is currently undersecured
at best, and was undersecured before the Petition Date.

[11] The Court must accept as true the factual allegations of the complaint and draw all reasonable
inferences in favor of the plaintiff.  Trans-Spec Truck, 524 F.3d at 320.

### G.    The Defendants' "Safe Harbor" (11 U.S.C. § 546(e)) Argument Must Fail, Particularly At the Pleadings Stage

Section 546(e) of the Bankruptcy Code provides a safe harbor against the avoidance and recovery of fraudulent transfers for certain transactions involving institutions and participants in the financial markets.  See 11 U.S.C. § 546(e).  However, "where a complaint sufficiently alleges that the transferee had actual knowledge of the underlying fraud, the transferee cannot prevail on a motion to dismiss on section 546(e) grounds."  O'Connell v. Penson Fin. Servs., Inc. (In re Arbco Capital Mgmt., LLP), 498 B.R. 32, 43 (Bankr. S.D.N.Y. 2013) (citation omitted).[12]  Here, the Complaint sufficiently alleges that the Defendants had actual knowledge that the payments they received and orchestrated would strip an insolvent corporation of what was intended to be working capital.  A safe harbor defense under § 546(e) is "premature at the motion to dismiss stage" unless the facts supporting the defense appear plainly on the face of the complaint. Wagner v. Wilson (In re Vaughan Co., Realtors), 2013 WL 960143, at *8 (Bankr. D.N.M. Mar. 11, 2013).  Here, the facts upon which the Defendants rely do not appear plainly on the face of the Complaint, and require the Court to defer to the movants' characterization of the facts.

### H.    The Davis Motion's Mandatory Abstention Argument (11 U.S.C. § 1334(c)(2)) Argument Must Fail as a Matter of Law, Fact, and Procedure

The Davis Motion argues that the Court must abstain from adjudicating Count I of the

---

[12] Arbco relies on S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC (In re Madoff Securities LLC), 2013 WL 1609154, at *1 (S.D.N.Y. Apr. 15, 2013), which found:

> Where the Trustee has sought to recover transfers made to a subsequent transferee, the avoidance of which would otherwise be barred by Section 546(e) as to the initial transferee, the subsequent transferee will not be able to prevail on a motion to dismiss some or all of the Trustee's avoidance claims simply on the basis of the Section 546(e) "safe harbor" if the Trustee has alleged that the subsequent transferee had actual knowledge of [the] fraud.

Complaint pursuant to 28 U.S.C. § 1334(c)(2).  As a preliminary matter, this argument must fail because it is not even properly before the Court; it must be brought as a separate motion.  As one Court succinctly put it:

> As for [the defendant's] mandatory abstention position, which position, the Court notes, *should have been advanced by way of a separate motion for mandatory abstention rather than via a Rule 12 motion to dismiss*, the Court must reject such position.

Bohm v. The Horsley Co. (In re Groggel), 305 B.R. 234, 237 (Bankr. W.D. Pa. 2004) (emphasis added).

Even assuming, for the sake of argument, that the Davis Motion's characterization of the claims is correct (which the Trustee does not concede), the abstention argument fails.  As bankruptcy courts have repeatedly found:

> Mandatory abstention under 28 U.S.C. § 1334(c)(2) requires that each of *six separate elements must be satisfied*: (1) the *motion to abstain* must be timely filed; (2) the underlying action must be based on a state law claim or cause of action; (3) an action *must have already been commenced in state court*; (4) the action must be able to be timely adjudicated in the non-bankruptcy court venue; (5) there must be no independent basis for federal jurisdiction that would have permitted the action to be commenced in federal court absent bankruptcy; and (6) the matter must be non-core under 28 U.S.C. § 157. *The moving party carries the burden to establish each of these six requirements . . . .*

In re Longview Power, LLC, 516 B.R. 282, 293-94 (Bankr. D. Del. 2014) (citations omitted, emphasis added); see also In re SemCrude, L.P., 428 B.R. 82, 100-01 (Bankr. D. Del. 2010); In re Mobile Tool Int'l, 320 B.R. 552, 556 (Bankr. D. Del. 2005).  Here, no action was previously commenced in state court and Davis has not filed a motion to abstain.  The fact that the moving party has the burden to establish each of the six requirements further supports that a request for abstention is not properly brought in the context of a motion to dismiss, where all inferences are read in favor of the non-moving party.  See Fisher Island Invests., Inc. v. Areal Plus Group (In re Fisher Island Investments, Inc.), 2014 WL 1343269 at *3 (Bankr. S.D. Fla. Mar. 28, 2014) ("mandatory abstention provisions should be narrowly construed and the abstention should be

exercised sparingly and cautiously."). Finally, mandatory abstention "is subject to the overarching principle that such abstention should only be granted if that will not adversely affect the bankruptcy proceedings." Falck Props., LLC, v. Walnut Cap. Real Estate Serva. (In re Brownsville Prop. Corp., Inc.), 473 B.R. 89, 93 n.4 (Bankr. W.D. Pa. 2012) (quotations and citations omitted). For all these reasons, the Davis Motion's argument for mandatory abstention must fail.

I.    **The Athena Motion's Argument that all Counts Must be Dismissed as to Eureka Must Fail**

The Athena Motion argues that because Eureka has been dissolved, the Complaint must be dismissed as to Eureka. The circumstances of Eureka's request closely resemble those in Collins v. Kohlberg and Co. (In re Sw. Supermarkets, LLC), where the bankruptcy court explained:

> [Defendant] moves for dismissal from the complaint of three Delaware Limited Partnerships that were dissolved and filed certificates of cancellation on May 16, 2003. [Defendant] argues that after the filing of the certificate of cancellation, these limited partnerships ceased to exist and therefore cannot be sued.
>
> If [defendant] is correct, the point is both moot and [defendant] lacks standing to argue it. If there is no entity there, then the Trustee's suit will gain him nothing but similarly cause harm to no one. But if there is no such entity, then who hired Perkins Coie Brown & Bain and Paul, Weiss, Rifkind to seek its dismissal? If the limited partnerships did so, they must exist and have assets sufficient to pay their lawyers. But if they did not do so on their own behalf, then who did? It is difficult to see how the other . . . defendants would have standing to move for their dismissal.
>
> [Defendant's] motion to dismiss the dissolved limited partnerships is therefore denied.

325 B.R. 417, 431 (Bankr. D. Ariz. 2005).

This Court should follow the example of Sw. Supermarkets and decline to dismiss the Complaint as to Eureka.

III.     The Trustee Has Sufficiently Pleaded All Counts in the Complaint

A.     **Recharacterization of Debt as Equity and Unauthorized Dividend (Count I)**

As set forth in detail above, the Trustee sufficiently pleads the elements for recharacterization of debt as equity, with regard to the Notes.  Further, the Complaint contains detailed factual allegations supporting a finding that the Debtor was insolvent at all relevant times.  "It is well settled that an insolvent Delaware corporation cannot pay a dividend." Musicland, 398 B.R. at 783 (citations omitted).  Because the Notes should be recharacterized as equity, the $13,862,165.29 payment made in connection with the 2011 Termination must be considered a dividend from an insolvent corporation.

The Davis Motion seizes upon 8 Del. C. § 170, which provides that a corporation may pay dividends to its equity holders out of its surplus equity, or if there is no surplus, out of its net profits for the year the dividend was made or the preceding year.  After explaining the motion to dismiss standard, the Davis Motion suggests that the Complaint must fail because it failed to state that the Debtor had no net profits (i.e., a conclusory recitation).[13]  However, the Complaint alleges more than sufficient facts to find that the Debtor was balance sheet insolvent and unable to pay its debts as they came due.[14]  To interpret those allegations to mean that the Debtor could have had a net profit at the relevant time not only strains credulity, it departs completely from the standard for a motion to dismiss.  Further, the caselaw that the Davis Motion would have the

---

[13] The Davis Motion disregards that the NWPA provided its own definition of insolvent, which was essentially balance sheet insolvent and unable to pay debts as they came due.

[14] The statute is more properly read as providing a safe harbor for a corporation that is balance sheet insolvent, but can show that it is profitable nonetheless.  Nothing in the Complaint remotely suggests that the Debtor was profitable.

Court disregard supports a finding that flat-out insolvency is sufficient to satisfy 8 Del. C. § 170.

See EBS Litig. LLC v. Barclays Global Investors, N.A., 304 F.3d 302, 305 (3d Cir. 2002) ("If

the stock dividend occurred when Edison was insolvent, or rendered Edison insolvent, it was

illegal under Delaware law, and voidable in bankruptcy.").  As one Delaware Bankruptcy Court

summarized, in the context of a motion to dismiss:

> Defendants argue that the pleadings insufficiently allege both the IT Group's insolvency
> during the time when the dividends were paid and the directors' knowledge of the
> insolvency. However, those arguments are not well-founded. The Complaint alleges that
> the IT Group was insolvent or in the vicinity of insolvency as early as March 1998.
> Further, the booked goodwill associated with the Roll–Up acquisitions is alleged to have
> inflated the IT Group's assets. Finally, Defendants are alleged to have artificially
> extended the life of the insolvent IT Group in order to keep making payments to the
> Carlyle Defendants, which is relevant for both the allegations of insolvency and of the
> directors' knowledge. Again, Defendants have notice of the basis of Plaintiff's claims,
> and Count IX therefore survives the 12(b)(6) motion.

In re IT Group. Inc., 2005 WL 3050611 at *16 (D. Del. Nov. 15, 2005) (citations omitted).

Nowhere does the IT Group court mention the debtor's net profits or surplus.

The Davis Motion also insists that the Complaint does not allege sufficient *scienter* on

the part of the Investors who received an unauthorized dividend, citing to PHP Liquidating, LLC

v. Robbins (In re PHP Healthcare Corp., 128 F. App'x 839 (3d Cir. 2005).  To the extent PHP

Healthcare is relevant, it supports the allegations in the Complaint and fails to support Davis's

argument, implying that a complaint is sufficient if it alleges that the receiving party "knew [the

corporation's] capital was impaired" at the time of the transfer.  Id. at 846.  The Davis Motion

argues that the Complaint contains no allegations to indicate such knowledge, apparently

ignoring extensive portions of the Complaint which do exactly that.  See e.g., Complaint  ¶¶171,

174-75, 190, 197, 204-205.

### B.    Avoidance and Recovery of Constructively Fraudulent Transfer Against Investors (Count II)

The UFTA provides that:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
. . .
>  (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>>  a. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>  b. Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

6 Del. C. § 1304(a)(2); 14 M.R.S.A. § 3575(1)(B).

The Complaint alleges all of the elements required to state a claim for a constructively fraudulent transfer under the UFTA. Specifically, the Debtor made the $13,862,165.29 payment to the Investors while it was insolvent (as evidenced by the fact that it was in a continuing default on all of its material obligations), and did not receive reasonably equivalent value (as evidenced by the fact that the Notes were perennially non-performing and should be treated as equity).

Courts examining allegations of constructive fraud under subsection (a)(2) focus on whether the debtor received reasonably equivalent value in exchange for the transfer, and whether the debtor was, effectively, insolvent. See, e.g., Litig. Trust of MDIP Inc. v. De La Rue Cash Systems Inc. (In re MDIP Inc.), 332 B.R. 129, 132-33 (Bankr. D. Del. 2005). These determinations are generally fact sensitive, particularly regarding the issue of "reasonable equivalence." See id. at 133 ("reasonable equivalence has a large factual component"). Courts examine the totality of the circumstances to determine reasonable equivalence, and courts have generally considered three factors: "(1) whether the transaction was at arm's length, (2) whether

the transferee acted in good faith, and (3) the degree of difference between the fair market value

of the assets transferred and the price paid."  See Brandt v. Trivest II, Inc. (In re Plassein Int'l

Corp.), 405 B.R. 402, 411 (Bankr. D. Del. 2009).  Allegations concerning all three factors appear

in the Complaint.

### C.    Avoidance and Recovery of Actually Fraudulent Transfer Against Investors (Count III)

The UFTA provides that:

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
      (1) With actual intent to hinder, delay or defraud any creditor of the debtor . . . .

6 Del. C. § 1304(a)(2); 14 M.R.S.A. § 3575(1)(A).

Actual fraud under the UFTA can be found with reference to certain "badges of fraud."

The UFTA provides a non-exhaustive list of such "badges of fraud," which include whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

6 Del. C. § 1304(b); 14 M.R.S.A. § 3575(2).

The Complaint again alleges all of the elements required to state a claim for an actually

fraudulent transfer under the UFTA.  Moreover, the pleading standards for fraud are relaxed somewhat when the plaintiff is a trustee who by nature lacks firsthand knowledge.  As the bankruptcy court in <u>Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.)</u>, summarized:

> [C]ourts take a more liberal view when examining allegations of actual fraud that are pled by a bankruptcy trustee in the context of a fraudulent conveyance, since "a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge."  In such circumstances, courts will allow allegations of circumstantial evidence to establish fraudulent intent, such as the well-established "badges of fraud."

361 B.R. 369, 395-96 (Bankr. S.D.N.Y. 2007) (citations omitted).

No single badge of fraud is determinative, and the inquiry resembles a totality of the circumstances inquiry.  <u>See</u> <u>Burtch v. Masiz (In re Vaso Active Pharm., Inc.)</u>, 2012 WL 4793241 at *10 (Bankr. D. Del. Oct. 9, 2012).  Accordingly, the inquiry is inherently fact-sensitive, and may require a court to make factual findings.  <u>See</u> <u>id.</u> at *10-16 (examining various badges of fraud in detail).

The Complaint pleads fraud with sufficient reference to the badges of fraud, including, among the enumerated badges, that the transfers were to insiders, the Debtor was insolvent, the transfer was of substantially all of the Debtor's working capital, the transfer deepened the Debtor's insolvency, and the value of the consideration received by the Debtor was essentially worthless.  Moreover, the transfer was orchestrated by the parties who received it, parties who were fully aware of the Debtor's dire financial condition.

### D.    Avoidance and Recovery of Insider Preferences Against Investors and Earlston (Counts IV & V)

The UFTA provides that "A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent

debt, the debtor was insolvent at that time and the insider had reasonable cause to believe that the debtor was insolvent." 6 Del. C. § 1305(b); 14 M.R.S.A. § 3576(2).   The analysis of claims under § 1305 of the UFTA tend to track those under § 1304(a)(2).  See Brandt v. Trivest II, Inc. (In re Plassein Int'l Corp.), 2008 WL 1990315 at *5 and *8 (Bankr. D. Del. May 5, 2008) (equating the elements of §§ 1305(a) and 1304(a)(2)).  The Complaint amply supports a finding that the $13,862,165.29 payment to the Investors was made for an antecedent (alleged) debt, while the Debtor was insolvent, and the Investors had reasonable cause to believe that the Debtor was insolvent (in fact, they were fully aware).

The insider preference count against Earlston incorporates the same allegations, namely that any payments were on account of the Term B Note, that the Debtor was insolvent at the time of such transfers, and Earlston, an insider of the Debtor, had reasonable cause to believe the Debtor was insolvent.   The Trustee requires discovery to determine the specifics of whether payments made to Earlston by the Debtor were on account of the Term B Note (and in what amounts), because, as the Complaint indicates, the Debtor had extensive relations with Earlston beyond just the Term B Note.

## Conclusion

WHEREFORE, for all the foregoing reasons, the Trustee requests that the Court deny the Motions to Dismiss, and issue such other and further relief as the Court deems just and necessary.

Dated:  November 10, 2015

ROBERT J. KEACH, solely in his capacity
as the chapter 11 trustee of Montreal, Maine
& Atlantic Railway, Ltd.

*/s/ Robert J. Keach*
Robert J. Keach
D. Sam Anderson
Roma Desai
BERNSTEIN SHUR
100 Middle Street
P.O. Box 9729
Portland, ME 04104-5029
(207) 774-1200 (telephone)
(207) 774-1127 (facsimile)